**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 05-1491

THEDA L. VAUGHAN; JAMES RICKY VAUGHAN,

Plaintiffs - Appellees,

versus

RECALL TOTAL INFORMATION MANAGEMENT,
INCORPORATED, a Delaware corporation; BRAMBLES
USA, INCORPORATED, a Delaware corporation,

Defendants - Appellants.

Appeal from the United States District Court for the District of
South Carolina, at Greenville. Henry F. Floyd, District Judge.
(CA-02-402-6-HFF)

Argued: September 20, 2006          Decided: February 14, 2007

Before MOTZ and GREGORY, Circuit Judges, and Richard L. VOORHEES,
United States District Judge for the Western District of North
Carolina, sitting by designation.

Affirmed in part, reversed in part, and remanded by unpublished per
curiam opinion.

**ARGUED:** Michele L. Odorizzi, MAYER, BROWN, ROWE & MAW, L.L.P.,
Chicago, Illinois, for Appellants. Ellis Murray Johnston, II,
HAYNSWORTH, SINKLER & BOYD, P.A., Greenville, South Carolina, for
Appellees. **ON BRIEF:** Maggie J. Schneider, MAYER, BROWN, ROWE &
MAW, L.L.P., Chicago, Illinois, for Appellants. Theodore Sanders
Stern, Jr., COVINGTON, PATRICK, HAGINS, STERN & LEWIS, P.A.,
Greenville, South Carolina, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This dispute involves interpretation of a Stock Purchase Agreement ("SPA" or "Agreement") entered into by the parties. The Agreement governs the terms of sale of a document shredding business previously owned and operated by Appellees Theda L. Vaughan ("Theda") and James Ricky Vaughan and purchased by Appellants Recall Total Information Management, Inc. ("Recall"), and Brambles USA, Inc ( "Brambles").  The Agreement provides that the purchase price is to be paid as follows: 1) a lump sum payment upon closing; and 2) a  percentage of the business's "Sales Revenues" for the following year ("Earnout" payment).  The parties disagree on what constitutes "Sales Revenues" under the terms of the contract as well as the proper method of calculation of the Vaughans'  Earnout.  Recall also asserts a Counterclaim that seeks to recover a portion of the Earnout monies already paid to the Vaughans or a set-off against any award the Vaughans receive. Appellant Recall challenges the trial court's interpretation of certain portions of the Agreement and the dismissal of its Counterclaim.

I.

The Vaughans are former shareholders of Secured Data of America, Inc. ("SDA"), a Tennessee corporation.  SDA was a document destruction company that specialized in the destruction of

2

confidential documents and data. SDA was headquartered in Greenville, South Carolina, and maintained operating facilities located primarily on the East Coast. SDA also had a facility in Texas.

Recall is an information management company incorporated in Delaware with its principal place of business in Atlanta, Georgia. Recall provides services such as physical and electronic document storage and retrieval, protection of computer backup data, and destruction of sensitive documents. Brambles is the parent company of Recall, which likewise has its principal place of business in Atlanta, Georgia.[1]

In November 1999, the Vaughans had an offering memorandum prepared for the purpose of determining the estimated market value of SDA. Among other things, the offering memorandum boasted SDA's existing client base, operating capacity figures demonstrating an ability to expand, and the potential for significant growth in sales. The offering memorandum generated interest in SDA by other companies.

On August 2, 2000, the Vaughans contracted to sell SDA to Recall pursuant to a Stock Purchase Agreement. (J.A. at 530-83; Pl.'s Exh. 1) Theda Vaughan was the general manager of SDA and James Ricky Vaughan was Chief Executive Officer. The Agreement

---

[1]Brambles is a party to the SPA and is jointly and severally liable with Recall.

provided that Theda would remain employed at SDA as Executive Vice President and be responsible for company sales. In addition to retaining Theda, Recall entered into employment agreements with two other SDA employees, one of whom was Christopher Lupo ("Lupo").[2] Recall agreed that if it materially changed the job positions of these employees, it would provide Theda with comparable or better support. Mr. Vaughan was to stay on as a consultant for up to six months after closing.

At closing, the Vaughans were paid $15,522,960. The Vaughans also had the potential to receive up to an additional $11,750,000 based on an Earnout formula contained in the Agreement. The parties agreed to the Earnout as a means for providing additional compensation to the Vaughans as the projected sales numbers approached their targets.[3] The Earnout was payable in two

---

[2]Under the terms of his employment agreement, Lupo was to "assist with sales" but "be responsible for" other areas of the business. (J.A. at 1112, ¶39) Lupo was later reassigned with Theda's blessing and Theda hired a national sales manager and three other regional sales representatives to assist her with sales. Theda asserted at trial that Lupo's reassignment was one of the events that hindered SDA's ability to reach its sales potential.

[3]During negotiations, Theda represented to Recall that SDA was worth more than its past revenue figures suggested. Theda projected significant growth in sales for 2000 and 2001, based in large part on anticipated increased sales from existing customers such as Bank of America and First Union National Bank. Theda testified at trial that projected sales revenue from Bank of America calculated as of the time the SPA was executed had proven to be inaccurate when compared with actual sales.

4

installments:  1) the Vaughans were entitled to a partial Earnout after six months if sales revenues exceeded $6,150,000; and 2) the Vaughans were entitled to a final Earnout after 12 months if sales revenues exceeded $12,300,000.   To maximize that final Earnout payment, SDA needed to achieve sales revenues in the amount of $17,950,000  for the year following execution of the SDA - the period August 2, 2000 through August 1, 2001 ("Earnout period"). If  accomplished, this gain in sales would represent a growth of nearly 50%.

During the Earnout period, Recall acquired several other document shredding businesses, including InstaShred, DocuShred(PA), DocuShred (TN), SecureShred (Greenville) and MobilShred. With the exception of MobilShred, Recall was entirely responsible for these acquisitions.  Although Recall financed the purchase of MobilShred, Theda and Chris Lupo are credited with helping to facilitate the MobilShred acquisition.

In May 2001, after Recall acquired InstaShred, Recall reorganized its document destruction operations into two separate companies - "SDS West" and "SDS East" (or SDA). InstaShred was primarily serving the West Coast or western United States and SDA was primarily serving the East Coast plus Texas.  Recall elected to divide the businesses geographically, placing SDA's Texas operations under SDS West and all operations east of Texas under SDS East.

5

After acquisition, DocuShred (PA and TN) and SecureShred ceased to operate. The accounts previously serviced by these businesses were absorbed and serviced by SDS East (SDA).[4] SDA's servicing of these accounts means SDA picked up, shredded, and baled the trash in addition to selling the paper and billing the client. SDA also took over former InstaShred operations in Virginia and Florida. The rest of InstaShred's business made up Recall's SDS West operations. MobilShred's operations were placed under SDS West since its operations were centered in Vancouver and Calgary.

SDA did not meet its sales goals for the Earnout period. Instead, based upon estimated sales revenues of $15,706,000, the Appellees were paid $1,236,000 after the first six months and an additional $5,847,000 at the end of the Earnout period, for a total Earnout payment of $7,083,000.[5] Thus, the total payout for the sale of SDA was $22,305,960.

In February 2002, the Vaughans commenced the underlying civil action alleging breach of contract. Specifically, the Vaughans complained that 1) Recall wrongfully excluded $522,649 of sales revenues generated by SDA during the Earnout period; and 2) Recall,

---

[4]The sales revenues earned or generated as a result of subsequently acquired entities' accounts are referred to by the parties as "acquisition revenues."

[5]The total Earnout payment of $7,083,000 was $4,667,000 less than the maximum Earnout.

in violation of the "good faith" (express and implied) provisions of the SPA, prevented Theda from maximizing her Earnout.

In May 2003, Recall amended its Answer to include a counterclaim, the gist of which was that Recall had *overpaid* rather than underpaid Theda. According to Recall, the Earnout was not calculated properly because SDA had been over billing one of its clients - Bank of America. Following the Earnout period, Recall reached an agreement with Bank of America whereby Recall repaid a portion of the overcharge and negotiated a new contract.

The district court presided over a three-day bench trial. At the conclusion of the trial, the district court rejected the Vaughans' allegation that Recall, in bad faith, prevented SDA from reaching its projected sales goal.[6] (J.A. at 1111-20, ¶¶21-84, and 1128, ¶1) However, the district court ruled in favor of the Vaughans on the acquisition revenue issue, finding that SDA performed the actual services and "generated" the revenue previously attributable to the acquired entities. (J.A. at 1121-23, ¶¶86-92) In essence, the district court found that SDA helped Recall absorb the newly acquired businesses by assuming responsibility for some, if not all, of the work. The district court expressly noted that the Vaughans' evidence was more credible on this claim. (J.A. at 1127 , ¶116) Alternatively, the district

---

[6]Although not entirely successful on their claims in the district court, Appellees did not cross-appeal.

7

court found that Recall was estopped from contesting this claim in that Recall had waived its right to challenge the calculation of Theda's Earnout payment. (J.A. at 1121, ¶86) With respect to the MobilShred acquisition, the trial judge found that the good faith provision within the Agreement required Recall to credit MobilShred revenues to SDA because Theda and Chris Lupo were largely responsible for the acquisition. (J.A. at 1123, ¶¶93-5) The district court treated Recall's counterclaim as an indemnification or breach of warranty action and deemed it untimely pursuant to the terms of the Agreement. (J.A. at 1124-1128, ¶¶106-11)

The district court's rulings were based on its interpretation of the Stock Purchase Agreement as a matter of law. Finding the Agreement unambiguous, the district court did not consider extrinsic evidence.

## II.

On appeal, the trial court's judgment following a bench trial is subject to a "mixed standard of review – factual findings may be reversed only if clearly erroneous, while conclusions of law, including contract construction, are examined *de novo*." Roanoke Cement Co., LLC v. Falk Corp., 413 F.3d 431, 433 (4th Cir.2005).

## III.

Recall raises the following issues on appeal: 1) Whether the trial court erred as a matter of law by construing the SPA's "Sales

8

Revenue" definition to include acquisition revenues of document shredding operations serviced by SDA during the Earnout period; 2) Whether the trial court's factual findings with respect to estoppel or waiver of Recall's right to challenge calculation of the Earnout payment are clearly erroneous; 3) Whether the trial court erred as a matter of law by construing the SPA's good faith and sales revenue provisions as requiring Recall to credit SDA for the MobilShred acquisition revenues; and 4) Whether the trial court erred as a matter of law by dismissing Recall's counterclaim as untimely pursuant to the 18-month limitations period within the SPA. Each of these issues is addressed in turn.

For the reasons set forth, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.

IV.

A. Acquisition Revenues / "Sales Revenues" Under The SPA

Recall contends that the district court erred as a matter of law in construing the SPA. Recall claims that the SPA's definition of "Sales Revenues" should not have been interpreted to include SDA's sales from contracts acquired by SDA as a result of Recall's business acquisitions during the Earnout Period.[7] In the alternative, Recall argues that the Agreement is ambiguous,

_____

[7]Recall suggests that a construction of the SPA consistent with their argument would result in a finding that the Vaughans' Earnout payment must be reduced by approximately $1,068,923.

9

requiring the consideration of extrinsic evidence. We disagree with both propositions.

i. Applicable Rules Of Contract Construction Under South Carolina Law[8]

In construing the SPA, it is our function "to ascertain and give effect to the intention of the parties, looking first to the written instrument itself." Campbell v. Bi-Lo, Inc., 301 S.C. 448, 392 S.E.2d 477, 479 (Ct. App.1990).

The Court must first determine, as a matter of law, whether or not the Agreement is ambiguous. South Carolina Dep't of Natural Ress. v. Town of McClellanville, 345 S.C. 617, 550 S.E.2d 299, 302-303 (2001). "[A] contract is ambiguous only when it may fairly and *reasonably* be understood in more ways than one." Goldston v. State Farm Mut. Auto. Ins. Co., 358 S.C. 157, 594 S.E.2d 511, 519 (Ct. App.2004) (*emphasis added*); South Carolina Dep't of Natural Ress., 550 S.E.2d at 302.

Our construction of the Agreement is guided by common sense and good faith. *See* C.A.N. Enters., Inc. v. South Carolina Health and Human Servs. Fin. Comm'n, 296 S.C. 373, 373 S.E.2d 584, 586 (1988). In other words, "where one construction makes the provisions unusual or extraordinary and another construction which is equally consistent with the language employed, would make it

---

[8]South Carolina contract law governs construction of the Stock Purchase Agreement. (J.A. at 579, Pl.'s Ex. 1 at §9.6)

10

reasonable, fair and just, the latter construction must prevail."
Id. (*citing* Farr v. Duke Power Co., 265 S.C. 356, 218 S.E.2d 431, 434 (1975)).

In determining the question of ambiguity, the Court considers the Agreement in its entirety. *See* Yarborough v. Phoenix Mut. Life Ins. Co., 266 S.C. 584, 225 S.E.2d 344, 349 (1976)("As a rule of construction, the Court must consider the entire contract between the parties to determine the meaning of its provisions.")

"If the contract's language is clear and unambiguous, the language alone determines the contract's force and effect." Goldston, 594 S.E.2d at 518.

> ii. The SPA , Taken As A Whole, Can Reasonably Be Construed Only As Encompassing Acquisition Revenues Earned and Billed (Or Generated) By SDA

According to Recall, acquisition revenues do not fall within the scope of SDA's "Sales Revenues" as defined by the SPA. Specifically, Recall contends that subsection (2) – "All gross revenue generated by the Company from **new contracts or agreements from any source**" - does not include new contracts or agreements obtained via a subsequent acquisition. As explained below, Recall's argument is contrary to the plain language of SPA.

Recall's first two arguments hinge upon interpretation of the SPA provisions addressing sales revenues, good faith, and the restrictions on competition during the Earnout period. We turn now to the relevant language in the SPA.

11

Section 1.4 of the SPA, entitled "Earnout Payments," sets forth how the Vaughans' Earnout is to be calculated, beginning with the "good faith" provision in Section 1.4(a). Section 1.4(a) provides insight as to the significance of the Earnout Payments as well as the parties' intent. *See* <u>Goldston</u>, 594 S.E.2d at 518 ("The primary purpose of all rules of contract construction is to determine the intent of the parties.") Section 1.4(a) reads in pertinent part:

> It is the parties' intention that a significant part of the Purchase Price will be paid pursuant to this Section 1.4, and **Purchaser agrees to act reasonably in good faith** to allow Theda to have a fair opportunity to qualify for the maximum payments provided for by this Section 1.4. The previous sentence shall also apply to Purchasers' Affiliates[9], except as provided below. Neither the foregoing nor anything in this agreement shall affect or apply to the current or **subsequent operations of . . . any business subsequently acquired by [Recall] . . . engaged in document shredding services**, including, without limitation, any current business . . . **or any business subsequently acquired by Purchaser or its Affiliates and engaged in document shredding services** (all such current and subsequent businesses being collectively referred to as "Purchaser / Affiliate Shredding Businesses"). The **sole obligation** of Purchaser / Affiliate Shredding Businesses shall be as set forth in this Section 1.4(f)(7) . . .

(J.A. at 545-46; §1.4(a))(*emphasis added*). Thus, Section 1.4(a) imposes a good faith obligation on Recall and its Purchasers'

---

[9]The "Affiliate" of any Person means "any other Person directly or indirectly controlling, controlled by or under common control with such Person." (J.A. at 538.)

Affiliates "to act reasonably in good faith" such that Theda would have a "fair opportunity" to maximize her Earnout Payment.

**"Sales Revenue"** is defined broadly in the Stock Purchase Agreement as:

> "[T]he aggregate of all the Company's[10] **gross revenue earned and billed** for the Earnout Period . . . and consisting of the following:
> ***
> (2) All gross revenue **generated** by the Company from **new contracts[11] or agreements from any source** for document shredding services . . .

(J.A. at 546; §1.4(e))(*emphasis added*). The terms "earned," and "generated" are not expressly defined within the SPA. Likewise, the SPA does not clarify what is meant by "new contracts or agreements."

The SPA also includes a non-competition clause stating Recall's policy of preventing a "Purchased Business" from competing with SDA under certain circumstances. (J.A. at 549-50, ¶¶1.4(f)(7)(A) and (B)) The non-competition clause within Section 1.4(f)(7) speaks most directly to the intended relationship between SDA and subsequent acquisitions during the Earnout period:

> If Purchaser or Parent (or any of their Affiliates) purchase any business in North

---

[10] "Company" means Secured Data of America, Inc. (J.A. at 538.)

[11] "Contract" means "any contract, lease, commitment, sales order, purchase order, indenture, mortgage, note, bond, instrument, license or other agreement." (J.A. at 539.)

13

America during the Earnout Period . . . (each such business being a "Purchased Business"), then with respect to each Purchased Business:

(A) Purchaser and Parent will not institute a corporate policy preventing the Company from competing against the Purchased Business for new business (being business not previously serviced by the Purchased Business); and

(B) Purchaser and Parent will not permit the Purchased Business to compete against the Company for the services and locations (1) covered by the written customer contracts listed on item 5 to Schedule 2.16 and the contract resulting from rfp number 64960-001-001 dated April, 2000, and any subsequent variation thereof and (2) previously provided to Current Customers and serviced by the Company within the two year period prior to Closing; provided that the foregoing shall not restrict any service to any location of a Current Customer . . .

Purchaser / Affiliate Shredding Businesses in North America shall be subject to the requirements of (A) and (B) above during the Earnout Period. The **sole obligation** of Purchaser / Affiliate Shredding Businesses shall be as set forth in this Section 1.4(f)(7). . .

(J.A. at 549-50.) *(emphasis added)* Section 1.4(f)(7) may be said to provide for a level playing field for SDA and Recall and its Purchaser / Affiliate Shredding Businesses during the Earnout period. SDA is free to compete with any Purchaser Affiliates for "new business," while its existing contracts and locations are protected.

Viewed as a whole, the SPA is not ambiguous. Pursuant to the Agreement, for revenues to fall within SDA's "Sales Revenue"

14

provision, SDA had to (1) generate or earn and bill the revenue, (2) as a result of new contracts or agreements from any source (3) for document shredding services.[12] The district court found that SDA "earned and billed," or "generated" the acquisition revenue at issue. In construing the introductory language of §1.4(e), the district court applied an ordinary, every day meaning of the word "earned" - "to acquire by labor, service, or performance." (J.A. at 1121, ¶87) Based upon undisputed facts, the district court then found that SDA performed under the contracts at issue by providing the actual document shredding services and that SDA billed said accounts. The district court found that SDA, in fact, "generated" the revenue. (J.A. at 1121-22, ¶88)

The district court also found that the acquisition revenues resulted from "new contracts or agreements" because SDA had never serviced these customers before.[13] While the word "new" hardly needs defining, its ordinary meaning is "having been made or come into being only a short time ago; recent" or "recently arrived or established in a place, position, or relationship." *See*, *e.g.*, American Heritage Dictionary of the English Language, Fourth (2000).

---

[12]All of the revenues were derived from the performance of document shredding services so the third criteria noted above is not contested.

[13]The SPA does not specify whether contracts coming under the umbrella of SDA for service due to a subsequent acquisition by Recall are to be treated as "new."

In addition to its ordinary meaning, the Court looks to Section 1.4(f)(7)(A), which defines "new business" as "business not previously serviced by the Purchased Business." (J.A. at 549.) Applying the same definition to SDA, we find that any contract not previously serviced by SDA, whether obtained via acquisition or otherwise, fits squarely within the language of the Agreement.

Furthermore, because SDA's sales revenues can be "from any source," the fact that the contracts resulted from Recall acquiring and dissolving another document shredding business makes no difference. In short, the language "from any source" can *reasonably* be interpreted only as inclusive of acquisition revenues.

According to Recall, the language within Section 1.4(a) referring to the non-competition clause as the Purchaser / Affiliates' "sole obligation" means that Recall owes Theda and SDA nothing for the services SDA performed in connection with acquisitions during the Earnout period. Read together, Sections 1.4(a) and (f)(7), undermine Recall's argument. Section 1.4(a) speaks in terms of continuing document shredding "operations" of a business subsequently acquired by Recall and contemplates that "any business subsequently acquired . . . and engaged in document shredding services" is subject to the anti-competition clause. (J.A. at 549-50.) As already noted, several of the acquired entities ceased operations entirely or at least at certain facilities. The anti-competition clause within §1.4(f)(7) only makes

16

sense if the integrity of the acquired entity is maintained and the entity continues to be viable. A dissolved entity simply poses no competitive threat to SDA. For this reason, it makes little sense to construe the language as Recall suggests. Given the plain language of the Agreement, a more reasonable construction would provide that Recall could acquire and operate other document destruction businesses without the need to credit SDA with the revenue as long as, once acquired, the companies were operated independently of SDA.

It is also clear from Section 1.4(f)(7) that the parties contemplated future acquisitions of document shredding businesses by Recall when the SPA was drafted. The Agreement expressly addressed the treatment of acquisition revenues from Southland Information Destruction ("Southland"). The parties made their intent clear regarding the revenues generated by SDA as a result of the Southland acquisition. The Agreement provided that "[a]ll gross revenues from customers acquired in the Southland Acquisition" would be included within SDA's sales revenues. (J.A. at 547.) At the inception of the SPA, Southland was the only acquisition the parties knew was a certainty.[14] Southland was also the only acquisition financed entirely by SDA rather than Recall. However, the fact that Southland's subsequently acquired revenues are expressly addressed

_____

[14]SDA and Southland entered into an Asset Purchase Agreement on June 30, 2000. (J.A. at 542.) The SDA / Southland transaction closed simultaneously with Recall's purchase of SDA.

17

within the SPA is instructive on at least three points.  First, this provision tells us that the parties knew how to include (or exclude) acquisition revenues from sales revenues. Secondly, it distinguishes between "customers acquired" from Southland and Southland itself - a distinction not made in the SPA with respect to Recall's Purchasers' Affiliates or Purchased Businesses.  Finally, it demonstrates the parties' recognition that issues surrounding calculation of Theda's Earnout might arise post-merger with respect to subsequent acquisitions. While it is conceivable that the parties' failure to be more explicit concerning Recall's subsequent acquisition revenue was due to poor drafting rather than the actual intent of the parties, it is not the role of the court to speculate or rewrite the terms of the Agreement where the language actually used leaves no plausible room for Recall's interpretation.

Considering the Stock Purchase Agreement as a whole, the Court finds there is only one *reasonable* interpretation of the Sales Revenue provision. *See* C.A.N. Enters., 373 S.E.2d at 586 (noting that an unambiguous contract "must be construed according to the terms the parties have used, to be taken and understood in their plain, ordinary and popular sense").  For these reasons, we find the SPA and its definition of "Sales Revenues" unambiguous. Accordingly, the district court properly relied on the plain language of the SPA in construing the Agreement.

18

B. The District Court's Factual Findings Related To Waiver & Estoppel By Recall Are Not Clearly Erroneous

Recall also challenges the district court's alternative finding of waiver and estoppel. Section 1.4(g) of the SPA states:

> "Within twenty (20) days after the end of each calendar month, **Purchaser** <u>shall</u> furnish to Theda a report describing the amount of Sales Revenues for such month, the sources thereof for such month, and any revenues of the Company for such month **which Purchaser believes** do not qualify as Sales Revenues."

(J.A. at 550.) *(emphasis added)* The district court found that Recall never submitted any such monthly report as contemplated by the SPA. (J.A. at 1123, ¶91) While the Agreement does not expressly identify the purpose of this provision, the parties' manifest intent was to provide an avenue for contemporaneous identification and resolution of any dispute about sources and calculation of sales revenues. Significantly, the onus in this regard was on Recall - not SDA or Theda.

Nevertheless, Recall blames Theda for its own failure to act. Recall points to two monthly reports reflecting revenue trends submitted by Theda during the Earnout period. In both, the acquisition revenues are identified as such and placed under a heading separate from other SDA accounts. (J.A. at 854-55.) Recall contends there is nothing expressly stating that Theda considered these acquisition revenues as SDA's "Sales Revenues" for purposes of calculating her Earnout payment. Thus, according to Recall, there was nothing for Recall to object to. Recall's argument is

19

specious.  The inclusion of these revenues in the report purporting to represent SDA's monthly "revenue trends," and the fact that the acquisition revenue figures are included in SDA's monthly revenue *totals*, at least put Recall on inquiry notice. Recall took no action. Furthermore, the language of §1.4(g) makes clear that the mandatory report from Recall is not contingent upon receipt of any monthly report from Theda or SDA.  Rather, the 20-day notice and report requirement incumbent upon Recall is triggered by "the end of each calendar month."  In light of Recall's failure to inquire or contest SDA's monthly revenue totals in any way, its protest in this regard is unavailing. The district court's reliance on estoppel and waiver principles was appropriate and supports its ruling on this issue.

C.  The District Court Erred In Construing The SPA To Credit MobilShred Sales Revenues To SDA

Recall also contends that the district court erred in concluding SDA was entitled to credit for MobilShred's revenues earned and billed (or generated) during the Earnout period. We agree. The district court found that revenues resulting from Recall's acquisition of MobilShred, whose accounts were ultimately assigned to SDS West for service, should have been included in SDA's aggregate sales revenues figure and the Earnout calculation.  The district court relied heavily on the good faith language within §1.4(a) in support of this interpretation of the Agreement.  The

20

trial judge found that Theda and Lupo were "principally responsible" for the acquisition of Mobil Shred. (J.A. at 1123, ¶93) Despite its own findings regarding the absence of bad faith on the part of Recall, the trial judge was troubled by the fact that Recall utilized Theda and Lupo to make the acquisition, which purportedly eliminated potential SDA customers, and then assigned the contracts to SDS West. (J.A. at 1123, ¶94) Although SDA did not actually perform the document shredding services - said performance having been previously equated by the lower court with the generation of revenue - the district court found that good faith required Recall to credit SDA with these revenues. (J.A. at 1123, ¶95)

This aspect of the district court's ruling cannot be reconciled with the rationale correctly employed to construe Section 1.4(e). Even if we found that Theda and Lupo "earned" the revenues as a result of their pre-acquisition contributions, SDA did not "bill" any of the MobilShred revenues. The definition applied earlier requires both - to earn <u>and</u> bill. Therefore, we cannot find that SDA generated the MobilShred revenues. Further, the good faith language within §1.4(a) should not be read effectively to impair the SPA's explicit definition of "Sales Revenues." <u>Hardee v. Hardee</u>, 355 S.C. 382, 558 S.E. 2d 264, 267 (Ct. App.2001) (court should employ a construction that gives effect "to the whole instrument and each of its various parts and provisions"). Finally, we are unable

21

to find any other language within the SPA to support the lower court's finding on this issue.

D.  Recall's Counterclaim Is Not Subject To The 18-Month Limitations Period Within §8.1 Of The SPA Applicable To Representations Or Warranties Prior To Closing

Recall also challenges the district court's legal conclusion that its counterclaim was barred by Section 8.1 of the SPA.  We agree with Recall on this issue.

As already noted, Bank of America was one of SDA's largest customers when Recall purchased SDA.  After the Earnout period, Recall discovered that SDA had been over-billing Bank of America. Without any contractual authority, SDA began to use an average weight (versus actual weight) of bins from the bank's high rise offices to determine the billing amount.  The parties refer to this as the "274 pound convention" or a "fixed weight billing practice." In September 2002, Bank of America learned of the mistake and demanded repayment. Recall eventually paid Bank of America a sum of approximately $1.5 million and negotiated a new contract.[15] (J.A. at 819-24.)

---

[15]The Vaughans question how much money was actually repaid to Bank of America as a result of SDA's actions.  Recall admits that even after learning of the over-billing, Recall continued to employ the "274 pound convention." The new contract with Bank of America may also have some bearing on this issue in that Recall contends that the renegotiated contract provided for "discounted" services or a "preferential rate"(a value of $1.8 million) negotiated in connection with the settlement between Recall and Bank of America.

22

Recall's Amended Answer & Counterclaim originally alleged two claims for relief complaining of SDA's over-billing of Bank of America - Fraudulent Inducement (Count I) and Breach of Stock Purchase Agreement (Count II).[16] However, Recall ultimately abandoned its fraudulent inducement claim. Count II, labeled by Recall as "The Breach of Stock Purchase Agreement" alleges that Bank of America "rejected the invoices for the amounts that it was overbilled" and "demanded repayment of those overbillings." It further alleges that Recall, as Counter-plaintiff, is "entitled under the SPA to a refund of the earn-out amounts paid to Counter-Defendants which were attributable to the overbillings to BoA." (J.A. at 32-3, ¶¶26-8)

The Vaughans do not dispute the fact that Recall incurred a liability to Bank of America as a result of SDA's prior practice. It is also undisputed that Theda's Earnout included Bank of America

_____

[16]The fraudulent inducement claim within Count I alleged that SDA was intentionally manipulating the billing of its Bank of America accounts to artificially inflate its sales figures; that SDA's 1999 financial statements reflecting the alleged inflated sales figures constituted a misrepresentation; and that Recall reasonably relied on SDA's 1999 financial statements in agreeing to the terms of the SPA. Recall's appellate filings note its decision not to pursue an action alleging that the Vaughans misrepresented material facts or breached any warranties based on the over-billing of Bank of America or any other pre Closing obligation. Recall's Post-Trial Proposed Findings Of Fact & Conclusions Of Law refers to a single counterclaim based upon a breach of contract theory limited to the post Closing conduct. (J.A. at 1102-03, ¶¶226-27)

sales revenues given the overlap between the contract terms and the Earnout period.[17]

The district court rejected Recall's contract theory, finding that Section 1.4 of the Agreement created no contractual duty on the part of the Vaughans. Instead, the district court characterized Recall's counterclaim as one for indemnification based upon an alleged misrepresentation or breach of warranty prior to closing and found that Recall did not provide timely notice of its claim under Section 8.2 of the Agreement. (J.A. at 1127, ¶112) The district court also found that any breach of warranty claim Recall could have brought against the Vaughans was now time-barred as a result of the 18-month limitations period within Section 8.1 of the SPA. (J.A. at 1125-27, ¶¶106-11) On appeal, Recall asserts, for the first time, that its counterclaim alleging breach of contract should be characterized as an action for "set-off," or merely a defense to any damages the Vaughans may be awarded.

Before addressing the merits of Recall's claim, we first determine whether it is properly before the Court. We have often held that an issue raised for the first time on appeal ordinarily will not be considered. *See* Muth v. United States, 1 F.3d 246, 250 (4th Cir.1993)(*citing* Nat'l Wildlife Fed. v. Hanson, 859 F.2d 313, 318 (4th Cir.1988); Stewart v. Hall, 770 F.2d 1267, 1271 (4th

[17]SDA's contract with Bank of America was effective July 1, 1999, through June 30, 2002. The Earnout period was from August 2, 2000, through August 1, 2001.

24

Cir.1985); <u>Maynard v. General Elec. Co.</u>,486 F.2d 538, 539 (4th Cir.1973). Nonetheless, we have made exceptions to this rule and recognized new arguments on appeal where the error is "plain" or failure to do so otherwise would result in a miscarriage of justice. <u>Id.</u> (*citing* <u>Nat'l Wildlife</u>, 859 F.2d at 318 (remanding to district court for recalculation of attorneys' fees under historic rather than current rate)). Such is the case here. Because this action seeks to ensure that the Earnout payment was calculated properly under the terms of the Agreement, failure to consider Recall's counterclaim would constitute a miscarriage of justice.

Although Recall pled a breach of contract claim, we find Recall's pleading more akin to an action for equitable recoupment. "Recoupment is the right of the defendant to have the plaintiff's monetary claim reduced by reason of some claim the defendant has against the plaintiff arising out of the very contract giving rise to the plaintiff's claim." *See* <u>FDIC v. Marine Midland Realty, Credit Corp.</u>, 17 F.3d 715, 722 (4th Cir.1994)(the "doctrines of setoff and recoupment are often confused")(*citing* <u>First Nat'l Bank of Louisville v. Master Auto Serv. Corp.</u>,693 F.2d 308, 310 n.1(4th Cir.1982)); <u>Tuloka Affiliates, Inc. v. Moore</u>, 275 S.C. 199, 268 S.E.2d 293, 295 (1980)(noting that recoupment only reduces the plaintiff's claim and construing what appellant described as his "second defense and counterclaim" as a recoupment defense)(*citing* <u>Mullins Hosp. v. Squires</u>, 233 S.C. 186, 104 S.E.2d 161 (1958); *See*

25

*generally*, <u>Para-Chem Southern, Inc. v. M. Lowenstein Corp.</u>, 715 F.2d 128, 131 (4th Cir.1983). In its counterclaim, Recall asks for "a reduction in the amount of the Sales Revenues subject to the earn-out and a corresponding reduction in the amount of the earn-out due to Counter-defendants." (J.A. at 33, ¶27)

Recall's recoupment claim may also be considered a compulsory counterclaim.[18] <u>Fraser v. Astra Steamship Corp.</u>, 18 F.R.D. 240, 241-42 (S.D. N.Y. 1955) (Under Rule 13 of the Federal Rules of Civil Procedure, "a counterclaim now encompasses both set-off and recoupment.") A compulsory counterclaim "arises out of the transaction or occurrence that is the subject of the opposing party's claim." FED. R. CIV. P. 13(a); <u>Painter v. Harvey</u>, 863 F.2d 329, 332 (4th Cir.1988). The following four inquiries may be relevant in determining whether a counterclaim is compulsory: 1) whether the issues of fact and law raised in the claim and counterclaim are largely the same; 2) whether res judicata would bar a subsequent suit on the party's counterclaim; 3) whether substantially the same evidence supports or refutes the claim as well as the counterclaim; and 4) whether there is any logical relationship between the claim and counterclaim. <u>Painter</u>, 863 F.2d

---

[18]A compulsory counterclaim does not require an independent basis for federal subject matter jurisdiction because the counterclaim arises out of the original action, as to which subject matter jurisdiction has already been established. *See* <u>Fraser</u>, 18 F.R.D. at 241-42 ("jurisdiction to entertain a *permissive* counterclaim must be affirmatively alleged and proved")(*emphasis added*).

at 331 (indicating it is not necessary for all of the four inquiries to be answered in the affirmative) (*citing* <u>Sue & Sam Mfg. Co. v. B-L-S Constr. Co.</u>, 538 F.2d 1048 (4th Cir.1976)).  Here, accurate calculation of the Earnout under the SPA is at the heart of the Vaughans' action as well as Recall's counterclaim.  Therefore, the issues of fact and law are similar, the evidence will overlap, and there is a logical relationship between the two actions.  Applying these criteria, we treat Recall's counterclaim as compulsory.  Notwithstanding Recall's inartful pleading, the objectives of Rule 13 are also best served by our entertaining Recall's recoupment defense.  <u>Painter</u>, 863 F.2d at 332(noting the purposes of Rule 13(a), including "to prevent the relitigation of the same set of facts" and to dispose of all the disputes between the parties in one action).  We now turn to the merits of Recall's claim.

As an initial matter, the district court mischaracterized Recall's counterclaim as an action arising out of an alleged misrepresentation or breach of warranty prior to closing.  Indeed, Appellees' counsel conceded as much during oral argument.  Section 8.1 of the Stock Purchase Agreement is entitled "Survival / Indemnification," and provides in part:

> "[N]o party will have any liability (for indemnification or otherwise) ***with respect to any representation or warranty, or covenant or obligation to be performed and complied with on or prior to the Closing***, unless on or before eighteen (18) months after the Closing the complaining party notifies the other party in writing of a claim specifying the factual basis of that claim in reasonable detail.  Notwithstanding the foregoing, (x)

27

*the representations and warranties* set forth at Sections 2.1, 2.2, 2.3, 2.4, 2.19, 3.1 and 3.2 [Representations And Warranties Of Sellers] shall survive indefinitely and (y) the *representations and warranties* at Section 2.17 [Employee Benefit Plans] and Section 2.21 [Taxes] shall survive . . . until the 90th day after the expiration of the applicable statute of limitations. Notwithstanding anything in this Agreement to the contrary, the limitations set forth in this Section 8.1 shall apply to any claims brought by Purchaser . . . based on any fact or circumstance *which is alleged to be a breach of or inaccuracy in any representation or warranty or a failure to perform a covenant or obligation to be performed and complied with on or prior to the Closing* regardless of whether the claim is brought pursuant to this agreement or otherwise and regardless of the theory upon which the claim may be based, whether contract, tort, warranty, strict liability, Federal and State Securities Laws or any other theory of liability.

(J.A. at 571-72; Pl.'s Exh. 1, §8.1) (*emphasis added*). Section 8.1, which focuses entirely on 1) representations and warranties prior to Closing, or 2) covenants or obligations to be performed and complied with on or prior to Closing, does not control. Even if Recall's counterclaim were based upon a representation or warranty, the conduct Recall complains of did not occur prior to Closing. In fact, neither Recall nor Bank of America learned of SDA's 274 pound convention until well <u>after</u> the Closing.

The district court also erred in finding that Recall failed to comply with the 20-day notice provision described in Section 1.4(g) and the prescribed procedures for seeking indemnification contained

within Sections 8.2 and 8.4.[19]  The §1.4(g) notice could not bar Recall's counterclaim given that Recall couldn't have possibly challenged SDA's sales figures for the Bank of America accounts until <u>after</u> it discovered the over-billing.[20]  Similarly, because Recall's counterclaim is not properly construed as an indemnification action within the purview of Section 8.1, Sections 8.2 and 8.4 do not apply.

Although the SPA does not expressly provide a defined remedy[21], the implicit mutual obligation to calculate the Earnout payments accurately encompasses Recall's right to contest the amount of damages Theda is entitled to collect based upon inaccurate calculations or "unearned" sales revenues arising from Bank of America contracts.  Recall contends that the over-billing resulted

---

[19]Section 8.2 identifies the circumstances under which the Purchaser (Recall) may be entitled to indemnification by the Seller (Vaughans).  Section 8.4 governs the notice of claims of indemnification and requires that the party seeking indemnification give timely notice of the dispute, tender the defense, and give advance notice of any proposed settlement.  The district court found that Recall did not observe any of these requirements. (J.A. at 1125-27, ¶¶112-13)

[20]The district court recognized the problem with relying on §1.4(g)but still found Recall's notice untimely because Recall failed to notify Theda of the potential claim until Fall of 2002 (more than 20 days past its discovery).

[21]There is nothing within the language of the SPA expressly providing for either of the remedies sought by the parties - recalculation of the Earnout if 1) an error is made by Recall in determining Theda's Earnout; <u>or</u> 2) an error is discovered after a customer has paid the invoice and corrected it beyond the one-year Earnout period.

in payment of Earnout monies not actually "earned." In addition to Section 1.4(e)'s requirement that Sales Revenues be "earned and billed" by SDA, Recall points to language within §1.4(e)(5), which sets forth specifically how Bank of America accounts are to be treated for purposes of determining Sales Revenues. Section 1.4(e)(5)provides that:

> "No bill or invoice rejected by the customer shall be considered "earned" or included in Sales Revenues for purposes of this Section 1.4, except to the extent subsequently paid by the customer."

(J.A. at 548.) Here, the invoices were paid by Bank of America prior to the discovery of the 274 pound convention. Recall posits that had Bank of America known of the overcharge prior to the end of the Earnout period, the bank would have rejected the charges and not submitted payment. In any event, we find that SDA did not actually earn the portion of Sales Revenues attributable to the over-billing of Bank of America.

Recall's counterclaim, an equitable recoupment action, will be remanded to the district court for further proceedings consistent with this opinion. In its ruling below, the district court noted that it did not need to consider the defenses to Recall's counterclaim asserted by the Vaughans, namely, volunteer and ratification. (J.A. at 1127, ¶113) For this reason, remand is required to determine if these defenses preclude Recall's recovery and, if not, the extent to which Recall may be entitled to recoupment.

30

V.

The district court noted that Recall conceded at trial it may have inadvertently omitted from its Earnout calculation Sales Revenues generated by SDA's Texas facility in July 2001. (J.A. at 1124, ¶99) The district court stated that the July 2001 Sales Revenues for SDA Texas were estimated at $25,000, and found that, if included, the July 2001 Sales Revenues would increase the amount due under the Earnout to approximately $7,070,191. Id. However, the district court did not expressly address this adjustment to the Earnout within its Conclusions Of Law. In addition, the Judgment does not reflect the judge's factual finding on this issue. (J.A. at 1107.) Upon remand, the trial judge should consider this omission in recalculating the Vaughans' Earnout Payment.

VI.

For the reasons stated herein, we AFFIRM in part, REVERSE in part, and REMAND to the district court for further proceedings consistent with this opinion.

AFFIRMED IN PART,
REVERSED IN PART,
AND REMANDED

31